IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **DEREK BYRD,** | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | CASE NO. 1:25-CV-00069-RP |
| | § | |
| **CITY OF AUSTIN; and** | § | |
| **JAVIER RODRIGUEZ, Individually,** | § | |
| **and in His Official Capacity,** | § | |
| *Defendants.* | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW, Derek Byrd ("Plaintiff") complaining of City of Austin, and Javier Rodriguez, Individually, and in His Official Capacity, ("Defendant and/or Defendants"), respectfully showing:

## 1.   Jurisdiction / Venue / Parties.

1.1 This action is brought under 42 U.S.C. § 1983, 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3).

1.2 Venue is proper in this Court under 28 U.S.C. § 1391(b) as this is the judicial district in which a substantial part of the events or omissions giving rise to this action occurred.

1.3 Plaintiff, Derek Byrd, is a citizen of the State of Texas.

1.4 Defendant, City of Austin, has appeared herein.

1.5 Defendant, Javier Rodriguez has answered and appeared herein. Each of the acts complained of herein arise from the conduct of Defendant Javier Rodriguez while acting under color of state law and was committed within the scope of his employment and authority with the Austin Police Department ("APD").

## 2.     Statement of Facts.

2.1 This is a civil rights action pursuant to 42 U.S.C. § 1983. On or about January 20, 2023, in Austin, Texas, Plaintiff Derek Byrd was a front-seat passenger in a vehicle owned and driven by Crystal Overby. In the backseat of their vehicle was Plaintiff's girlfriend, Derenda Trapp.

2.2 While Ms. Overby was driving, Officers Javier Rodriguez and Colin Guzman of the Austin Police Department instituted a traffic stop on their vehicle. Ms. Overby pulled over into the parking lot of an America's Best Value Inn hotel.

2.3 Officer Guzman represented that the purpose of the stop was because Ms. Overby's vehicle registration was allegedly expired. In response, Ms. Overby informed Officer Guzman that her vehicle registration was not expired, and while Ms. Overby was providing Officer Guzman with proof of her registration, Defendant Javier Rodriguez drew his gun on Plaintiff who was seated in the front passenger seat. Defendant recognized Plaintiff because of Plaintiff's various outstanding arrest warrants. Upon recognizing Plaintiff, Defendant directed Plaintiff to "put his hands on his fucking face" or he "will blow his brains out of his head".

2.4 While Defendant Javier Rodriguez had his weapon drawn on Plaintiff, Defendant threatened to "fucking kill" Plaintiff even though Plaintiff was inside a vehicle with two other people and despite Plaintiff's hands being clearly visible to Defendant.

2.5 At the time of the occurrence, Plaintiff was suffering from an ongoing drug addiction battle. Once Defendant Javier Rodriguez threatened to kill him, Plaintiff feared for his life. Not knowing if he was about to be shot to death by Defendant, Plaintiff began smoking a narcotic substance in a pipe.

2.6 Upon witnessing Plaintiff smoking, Defendant Javier Rodriguez punched Plaintiff in the face. Defendant then swung the passenger door open. In response, Plaintiff surrendered and placed his hands on his face in compliance with Defendant's earlier order. Ignoring Plaintiff's compliance, Defendant shot Plaintiff with his taser.

2.7 In response to being stunned by the taser, Plaintiff verbally notified the officers that he surrendered and placed his hands above his head. Nevertheless, Defendant tazed Plaintiff a second time, which caused Plaintiff to tumble out of the vehicle onto his hands and knees.

2.8 While on his hands and knees and facing the pavement, Defendant brutally and maliciously kicked Plaintiff in the back of his head.

2.9 Defendant Javier Rodriguez's acts and/or omissions, including using excessive force on multiple occasions, proximately caused personal injuries to Plaintiff.

2.10 At the time of the occurrence in question, Plaintiff was unarmed.

2.11 Each of Defendant Javier Rodriguez's acts and/or omissions occurred while in the course and scope of his employment with the Austin Police Department and under color of state law. Defendant Javier Rodriguez's acts amounted to an excessive and/or unnecessary use of force which were unreasonable under the circumstances.

### 3. Demand for Relief.

**A. Defendant Javier Rodriguez's Actions Violated Derek Byrd's Fourth and Fourteenth Amendment Constitutional Rights.**

3.1 The allegations contained in Paragraphs 2.1 through 2.11 are incorporated herein fully. Plaintiff demands relief under 42 U.S.C. § 1983 for the deprivation of his rights, privileges or immunities secured by the United States Constitution. Defendant Javier Rodriguez, acting under color of state law and in the course and scope of his employment with the Austin Police Department, violated Plaintiff's rights, privileges and immunities secured by

the Fourth Amendment of the Constitution, incorporated and applied to the states through the Fourteenth Amendment of the Constitution, including but not limited to the right to be free from unreasonable seizures. Said violations include but are not limited to when Defendant Javier Rodriguez –

- Pointed his firearm at Plaintiff and threatened to "blow his brains out of his head" despite Plaintiff posing no immediate threat of serious danger to him, Officer Guzman, or any other person present during the occurrence in question;

- Pointed his firearm at Plaintiff and threatened to "fucking kill him" despite Plaintiff posing no immediate threat of serious danger to him, Officer Guzman, or any other person present during the occurrence in question;

- Viciously punched Plaintiff in the face while Plaintiff was seated inside Crystal Overby's vehicle and despite Plaintiff posing no immediate threat of serious danger to him, Officer Guzman, or any other person present during the occurrence in question;

- Tazed Plaintiff even though Plaintiff was actively complying with Defendant Javier Rodriguez's order to place his hands on his face and despite Plaintiff posing no immediate threat of serious danger to him, Officer Guzman, or any other person present during the occurrence in question;

- Tazed Plaintiff a second time even though Plaintiff had already surrendered. After Defendant Javier Rodriguez shot Plaintiff with his taser and before shooting him with it a second time, Defendant gave Plaintiff less than three seconds to get out of the subject vehicle despite Plaintiff having already surrendered following the first taser shot; and

- Brutally kicked Plaintiff in the back of his head while Plaintiff was on his hands and knees and despite Plaintiff posing no immediate threat of serious danger to him, Officer Guzman, or any other person present during the occurrence in question.

3.2 Defendant Javier Rodriguez's actions were excessive, unreasonable under the circumstances and violated the Fourth and Fourteenth Amendments of the Constitution as Plaintiff posed no immediate threat of serious danger to Defendant Javier Rodriguez, Officer Colin Guzman, or any other person at the time of the occurrence in question.

3.3 Such acts and/or omissions committed by Defendant Javier Rodriguez were motivated by evil intent and/or involved a reckless or callous indifference to Plaintiff's federally protected rights

4

for which Plaintiff seeks the recovery of punitive damages against Defendant Javier Rodriguez to the maximum extent permitted by applicable law.

**B. The City of Austin Violated Derek Byrd's Constitutional Rights in a Manner Consistent with Their Documented History of Encouraging Excessive Force, Discouraging De-Escalation, and Glorifying the "Warrior Mindset".**

3.4 Plaintiff asserts this cause of action against the City of Austin under 42 U.S.C. § 1983 and *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978). City of Austin policymakers, including but not limited to former Mayor Steve Adler, Mayor Kirk Watson, former Chief of Police Brian Manley, and former Chief of Police Joseph Chacon, had actual, or at the very least, constructive, knowledge of the Austin Police Department's policies and/or customs related to the encouragement of the use of excessive force and the discouragement of de-escalation measures. On information and belief, the Austin Police Department Training Academy established policies and/or customs utilizing "paramilitary" training techniques and emphasizing a "paramilitary culture" throughout the Department. It also fostered a "warrior mindset" and an "us versus them" approach to policing the citizens of Austin.

3.5 On May 22, 2020, Dr. Sara Villanueva, the Organizational Development and Training Manager for the Austin Police Department, delivered a report ("Villanueva Report") within the scope of her authority as an employee of the City of Austin to former APD Police Chief Brian Manley after conducting her expert analysis on the strengths, weaknesses, opportunities and threats of the APD Training Academy. Dr. Villanueva's report is incorporated herein fully. Her findings include but are not limited to –

- "The APD Training Academy operates under a paramilitary training format" (Villanueva Report at 7 of 18);

- "The existing culture promotes an adversarial approach to training. . ." (Villanueva Report at 10 of 18);

- "The warrior mindset, and the fear that drives it, *much change*" (Villanueva Report at 10).

3.6 On December 29, 2020, Austin Chief Equity Officer Brian Oaks delivered a memorandum ("Oaks Memorandum") within the scope of his employment as an employee of the City of Austin to the Austin Mayor and City Council. The memorandum is incorporated herein fully and focused on APD's training customs and overall departmental culture and reported the following findings:

- "Multiple former cadets expressed concerns that training division staff foster a culture of violence, embracing brutality over wisdom throughout the academy experience. . . .Multiple former cadets allege that the academy is driven purely by brutality and that physical aggression is the primary quality that trainers seek when promoting cadets toward graduation" (Oaks Memorandum at 18-19 of 152).

- The qualifications for the use of the term culture of violence, including the institutional use and justification of the use of force, appear to have been satisfied [for the APD Training Academy]" (Oaks Memorandum at 19 of 152).

- "[M]any of the academy's trainers rely overwhelmingly on 'violent', 'brutal', 'traumatizing' practices designed to 'manufacture soldiers' rather than produce community-driven law enforcement professionals adept at de-escalation" (Oaks Memorandum at 20 of 152).

3.7 On December 5, 2019, the Austin City Cancel passed Resolution No. 20191205-066 that authorized a panel of Austin community members to issue an assessment of training materials and videos used in the training curriculum of the APD Training Academy. The panel authorized a report ("Community Report") of their findings on January 18, 2021. According to the authors of the report, the "videos we reviewed were chosen by leadership from the Austin Police Department and the Office of Police Oversight. The report found the following:

- "Overall, the videos displayed a great deal of dehumanization and lack of respect or just common humanity, both in terms of the verbal and physical interactions and the way community members were portrayed" (Community Report at 6 of 26).

6

- "One of the more pervasive biases we observed is the us-versus-them mindset. This bias existed at a fundamental, pervasive level" (Community Report at 14 of 26).

- "The us-versus-them bias was explicit in some of the videos—i.e. police work is 'the deadly game of cops and robbers'; however, much of it was implicit. This bias manifested in the following ways:

    - An enhanced focus on officer safety over the safety of the community as a whole. . . ."

    - A 'warrior' versus 'service' mentality in which officers see themselves as the 'good guys' and the public they interact with as 'bad guys. . . .'

    - Most importantly, a view of the profession as primarily concerned with exercising and maintaining control, where officers are the agents of control and the public stands in need of being controlled" (Community Report at 15-16 of 26).

- "Connected to both increasing militarism and the us-versus-them dichotomy, which we believe is at the heart of the repeated instances of police overreactions to threat and use of excessive force, is what researchers have called the 'danger imperative'—a belief in a constant and prevalent danger for police officers. . . .Several of the descriptions of the training materials in use at the APD academy state this plainly" (Community Report at 16 of 26).

- "Officers are trained to view every encounter as potentially life-threatening" (Community Report at 17 of 26).

- "The training we viewed, particularly the training Highlighting the danger imperative, definitely emphasized the safety of the officer above all else" (Community Report at 17 of 26).

- "From what we observed in videos and with conversations with instructors, we contend that the structure of policing as a whole, particularly the focus on control and the warrior mentality, reinforces the us-versus-them dichotomy in ways that tend toward escalation and grievous mistakes in judgment" (Community Report at 18 of 26).

3.8 On February 26, 2021, a memorandum entitled "Kroll's Preliminary Assessment of the Austin Police Training Academy" ("Kroll Memorandum") was delivered to the Director of Austin Office of Police Oversight, Farah Muscadin, and Deputy City Manager, Nuria Rivera-Vandermyde. The memorandum was authored by third-party consultant Kroll Associates,

Inc. The memorandum was prepared pursuant to authorization from the Austin City Counsel. It is incorporated herein fully.

3.9 The Kroll Memorandum made the following findings

- "The majority of APD and Academy leadership have questioned the assertion in Dr. Villanueva's report that paramilitary academies do not align well with the principles of community policing and problem solving and contribute to a 'warrior' mindset" (Kroll Memorandum at 5 of 22).

- "When asked if the Academy is proactively revisiting the existing curriculum and lesson plans. . . the answer provided is that Academy instructors and supervisors are awaiting further guidance and input from the new ODTM, whenever that person is hired to replace Dr. Villanueva" (Kroll Memorandum at 8 of 22).

3.10 On April 23, 2021, Kroll Associates delivered another report to the City of Austin (including to the Office of Police Oversight and City Manager's Office). The report is titled "Final Report on the Austin Police Department: Review and Assessment of Training Academy" ("Kroll Final Report"). The report was prepared pursuant to authorization from the Austin City Council.

3.11 The Kroll Final Report made the following findings:

- "The Academy at present remains a predominantly paramilitary training model" (Kroll Final Report at 6 of 113).

- "In the greater context of police work, seeing oneself primarily as a 'warrior' is a precarious mindset. . . .When officers are taught to see citizens as potential threats to their life, they learn to fear them. Thus, interactions between police and the community often start with suspicion, vigilance and caution, and positive encounters become infrequent, if not impossible. Furthermore, since officers are taught to physically control their space and react forcefully to noncompliance, they sometimes escalate otherwise peaceful encounters, making situations more dangerous for both sides" (Kroll Final Report at 16 of 113".

- "Other components of the military model may also be inconsistent with the demands of modern policing. . . .The use of recruiting videos and web content that routinely feature high-action sequences and appeals to strength and violence over service can send the wrong message about the nature of policing in a progressive urban environment" (Kroll Final Report at 16 of 113).

- "APD leadership has expressed its belief to Kroll that some aspects of a paramilitary structure are an essential component of police culture. . . .Indeed, the majority of APD and

> Academy leadership we spoke with questioned the suggestion in Dr. Villanueva's report that paramilitary academies do not align well with the principles of community policing and problem solving and contribute to a 'warrior' mindset, which leads to an 'us vs. them' mentality of officers on the front lines fighting crime" (Kroll Final Report at 49 of 113).

3.12   In 2015, the Office of Police Monitor ("OPM"), an agency created by the City of Austin to establish a system for the public to submit complaints against APD officers, investigated the APD's training policies and customs and made certain non-binding policy recommendations to APD based on the growing number of excessive force complaints. On information and belief, OPM recommended that APD revise its policies and customs to emphasize de-escalation and officer communication. On information and belief, policymakers within the APD rejected the recommendation.

3.13   As a result, Defendant City of Austin had implemented prior to and on the date of the occurrence in question the following policies and/or customs:

- Utilizing the Austin Police Department Training Academy to militarize Austin police officers and to emphasize and promote a "warrior" mindset and "us versus them" approach to policing;

- Using, authorizing, tolerating and/or encouraging excessive force against individuals who pose no reasonable threat of harm to the officers;

- Using, authorizing, tolerating and/or encouraging excessive force against individuals who are making reasonable attempts to comply with officers' commands;

- Disregarding and/or authorizing and/or tolerating and/or encouraging officers' failures to use de-escalation techniques; and/or

- Such other and further policies and/or customs alleged above and as discovery may reveal.

3.14   It is clear that the City of Austin and its policymakers had actual knowledge of the Austin Police Department's policies and/or customs in using paramilitary tactics and policing the citizens of Austin with a "warrior mindset" and "us-versus-them" mentality. These policies and/or customs were in place at the time Plaintiff's constitutional rights were violated, and said policies

9

and/or customs were a moving force of the violation of Plaintiff's constitutional rights. One or more City of Austin policymakers acted with deliberate indifference to the known and obvious consequences of these identified policies and customs, including the likely violations of the constitutional rights of people like Plaintiff harmed by said policies and customs.

### C. The Austin Police Department Has a History of Violating Citizens' Constitutional Rights in Ways Similar to the Violations Made the Basis of this Action.

3.15   As a consequence of APD's policies and/or customs in engaging in excessive force, encouraging escalation of conflict, and using paramilitary tactics to ensure compliance through violence, the following are specific examples of APD's history of violating citizens' Constitutional rights in ways similar to the violations of Plaintiff's rights:

- Carlos Chacon: On April 29, 2011, APD officers Eric Copeland and Russell Rose drew their weapons on Carlos Chacon, shouted profanity at him, and viciously punched and tasered him. The Honorable United States District Court Judge Sam Sparks, after reviewing footage of the incident, concluded "both officers' involvement in the entire struggle could likely have been avoided had the officers behaved reasonably" and "it was, after all, the officers who escalated the situation by drawing their weapons and shouting profanity." A jury found against the officers on May 13, 2015. APD never disciplined the two officers for violating Chacon's constitutional rights.

- Hunter Pinney: On December 20, 2013, Hunter Piney was struck in the knee and tasered by APD Officers in front of his home. The APD officers involved in the altercation were officers Michael Nissen, Cassandra Langston, and Chance Bretches. While Piney was merely attempting to provide the officers with identification, they forcibly grabbed him, struck him in the knee and tasered him. The officers involved were not disciplined for their excessive use of force.

- Adrian Aguado: On April 25, 2015, APD Officers Eric Copeland and Mark Bergeson ordered Adrian Aguado to exit from the back of their patrol car so that Aguado's handcuffs could be reapplied. As Aguado was complying with the command, Officer Copeland tasered Aguado without warning. As Aguado fell to the ground, Officer Copeland forcibly shoved his knee into Aguado's shoulder and fired his TASER a second time.

- Armando Martinez: On August 27, 2015, Armando Martinez was suffering from a hyperglycemic reaction and was laying under a tree in a park near downtown Austin. Because Martinez was incapacitated and could not comply with APD Officer Christopher

      Van Buren's commands, officer Van Buren chose to fire his TASER at Martinez even though Martinez posed no threat to any of the officers present.

- Paul Mannie: On March 28, 2019, numerous APD officers punched and kicked Paul Mannie in the face while they had him pinned to the ground despite Mannie not resisting. APD did not discipline the officers for their misconduct.

- Armando Herrera-Amaro: On December 1, 2020, APD officers Gadiel Alas and Alexander Khidre brutally tasered Armando Herrera-Amaro, an autistic and bipolar young man. APD did not discipline the officers for their misconduct.

- On June 23, 2021, James Johnson was taken to the ground by APD officer Brandon Salter who then repeatedly punched Johnson in the head, shattering Johnson's jaw. APD Officer Samuel Noble then fired his TASER on the unresisting Johnson. None of the officers involved were disciplined for their misconduct.

3.16    The above-referenced prior similar incidents are specific examples of citizens who were not resisting and/or posed no threat to the safety of APD officers but nevertheless were subjected to brutal excessive force in the form of verbal abuse, punching, tasing and/or kicking – the same or similar uses of excessive force to which Plaintiff was subjected by Officer Javier Rodriguez that amounted to violations of Plaintiff's rights.

3.17    The above-referenced prior similar incidents also reflect APD's dedicated execution of their policies and/or customs alleged above. Said policies and/or customs were a cause in fact of the deprivation of Plaintiff's rights inflicted as shown by Defendant Javier Rodriguez's excessive use of force. Defendant Javier Rodriguez broadcasted APD's policies and/or customs as clear as day when he made contact with Plaintiff: it was "us (Rodriguez) vs. "them (Plaintiff)." Rodriguez was ready to attack and kill "them" at a moments' notice if "order" was not maintained in accordance with his training. Put simply, Defendant Javier Rodriguez was merely following the above-alleged policies and/or customs when he violated Plaintiff's rights in the manner described above on page six and seven, incorporated herein fully.

3.18    On information and belief, the City of Austin policymakers have further ratified the policies and/or customs alleged above by:

- Failing to conduct an adequate internal investigation of the excessive force used on Plaintiff,

- Failing to take appropriate disciplinary and/or administration action against Defendant Javier Rodriguez, and/or

- Failing to implement changes to the policies and/or customs in response to the use of excessive force on Plaintiff and other similar incidents alleged above such that their failure amounts to City of Austin.

3.19    The totality of such failures related to the occurrence in question and the above-referenced prior similar incidents amounts to the City of Austin policymakers' ratification of unconstitutional actions of subordinate APD officers.

**D. Derek Byrd's Damages.**

3.20    Such acts and/or omissions committed by Defendant Javier Rodriguez and/or the City of Austin proximately caused personal injuries and damages to Plaintiff for which Plaintiff seeks recovery from Defendants, jointly and/or severally, in all elements recoverable under the substantive laws of the State of Texas, all such amounts to be determined by a duly-empaneled jury, and including but not limited to for the past and in reasonable probability the future: physical pain, mental anguish, physical impairment, and medical care expenses.

3.21    Plaintiff seeks prejudgment and post-judgment interest to the greatest extent permitted by applicable law.

3.22    Plaintiff also seeks all reasonable attorneys' fees and costs to which he is entitled pursuant to 42 U.S.C. § 1988.

3.23    Plaintiff pleads all matters herein supplementally and/or in the alternative, in order that these pleadings may effectuate the maximum degree of recovery available under

applicable law against one or more Defendants, individually and/or collectively, jointly and/or severally, found liable for such injuries and damages.

3.24    Plaintiff respectfully demands a trial by jury and has paid any required fee.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that upon final jury trial, Plaintiff recover from Defendants and/or each of them all actual damages and punitive damages allowed under federal law and the substantive laws of the State of Texas within the jurisdictional limits of this Court, plus costs of court, reasonable attorneys' fees, prejudgment and post-judgment interest, and other relief to which Plaintiff may be justly entitled at law and in equity.

Respectfully submitted,

CAMPOS LAW GROUP, PLLC
3910 South Interstate Highway 35, Suite 300
Austin, Texas 78704
Tel.  (512) 672-6585
Fax. (512) 532-6810
Service email: *service@acamposlaw.com*
Email: *emilio@acamposlaw.com*

By:    /s/ Emilio L. Guerra
       Emilio L. Guerra
       State Bar No. 24096331
       ATTORNEY FOR PLAINTIFF

## **CERTIFICATE OF SERVICE**

   I certify that on February 20, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of these filings to the following attorneys, and there are no other persons to be served in this matter:

**VIA EMAIL: gray.laird@austintexas.gov**
Deborah Thomas
Sara Schaefer
H. Gray Laird III
CITY OF AUSTIN – LAW DEPARTMENT
PO Box 1546
Austin, Texas 78746
Tel. (512) 974-1342
ATTORNEYS FOR DEFENDANTS

            By: /s/ Emilio L. Guerra
               Emilio Guerra